# EXHIBIT C

COMMONWEALTH OF MASSACHUSETTS

BRISTOL SS.                                        DOCKET # 2173CV00120

| | | |
|---|---|---|
| RYAN WELTER M.D., Ph.D. | ) | |
| Plaintiff, *pro se* | ) | |
| v. | ) | JURY DEMANDED |
| | ) | |
| MEDICAL PROFESSIONAL MUTUAL | ) | |
| INSURANCE COMPANY *dba* COVERYS, | ) | |
| JOSEPH DICKERSON, GREGG HANSON, | ) | |
| BRENDA RICHARDSON, | ) | |
| Defendants. | ) | |

**VERIFIED SECOND AMENDED COMPLAINT**

CONCISE STATEMENT OF CLAIM

Dr. Welter, as a policyholder, was at all times relevant to the claims within, a shareholder of the Medical Professional Mutual Insurance Company *dba* Coverys ("Coverys"). Dickerson, Coverys' employee, unlawfully accessed, in excess of authorization, Dr. Welter's open patient complaints data on Coverys' electronic database, that was off-limits to him as an account billing manager. Dickerson then tried to extort money from Dr. Welter based on data unlawfully exfiltrated from Coverys' protected computer database, and through the threatened use of an oral conversation with Dr. Welter that he secretly recorded in violation of ch. 272 § 99. Dr. Welter brought these felonies to Coverys' attention, including via CEO Hanson, and sought remedial action. Coverys refused to discipline Dickerson in any way and kept him on as the billing manager for Dr. Welter's account. Coverys then unilaterally canceled the malpractice policies for all persons working in Dr. Welter's clinic, thereby shutting the clinic down. Dr. Welter brings the below claims as a shareholder of Coverys because the leadership, including President/CEO Hanson and Chair Richardson, abdicated its duty to Coverys and its shareholders.

1

PARTIES

1        Plaintiff, Ryan Welter MD PhD, is a primary care physician who is further trained in hair

transplant procedures and operates several medical clinics across southern Massachusetts. He

works and resides in Bristol County.

2        Defendant Joseph Dickerson is an employee of Mutual *dba* Coverys, and resides in

Suffolk County. Defendant Brenda Richardson was the Board Chair for Coverys at the time of

the events complained of and resides in Essex County. Defendant Gregg Hanson was the

President and CEO of Coverys at the time of the events complained of and resides in Plymouth

County. Defendant Medical Professional Mutual Insurance Company *dba* Coverys ("Coverys")

was established by Section 6 of Chapter 362 of the Massachusetts Act of 1975 as a Joint

Underwriting Association and converted in 1995 to a mutual structure. Coverys is headquartered

in Suffolk County and operates across Massachusetts.

VENUE

3        Venue is proper in Bristol County as the plaintiff lives and works in Bristol County.

JURISDICTION

4        The Superior Court has primary jurisdiction because the damages are greater than

$50,000, and has jurisdiction over the federal law claims as well.

STANDING

5        Plaintiff has standing to bring claims against Dickerson for his many intentional torts,

including violation of the state's wiretap statute. Because Plaintiff was a policyholder of a

mutual, he was a part owner of Coverys, and has standing as a shareholder to bring claims

against Dickerson and against Richardson, Hanson and Coverys under the Computer Fraud and

Abuse Act (CFAA) for Dickerson's access in excess of his authorization and for an unlawful

purpose, as well as for Coverys rewarding Dickerson for his crimes and retaliating against

Plaintiff for revealing Dickerson's felonies, an act that reveals the Chair and President/CEO were

not simply disinterested directors but intended to run Coverys in a way that aided and abetted the

violation of state & federal laws, Coverts' HIPAA-PHI agreement and victimized policyholders.

6       In addition, the Plaintiff has suffered more than $5000 as loss or damages due to

Dickerson's violation of the CFAA. In Massachusetts, the Plaintiff need not contact all the

policyholders of a mutual prior to bringing suit against the Chair and President/CEO of the

mutual and the mutual itself. *Harhen v. Brown*, 431 Mass. 838 (2000)

## TIMELINESS

7       Dr. Welter first became aware of the violations reported here on February 21, 2018,

within three years of the date of filing of this complaint. Only on February 26, 2018, did Dr.

Welter become aware that Dickerson had been improperly accessing his confidential files held by

Coverys, a circumstance that Coverys was duty-bound to prevent, punish and report to Dr. Welter

as well as to the Federal government. He also became aware of the illegal wiretapping at the

same time. "As said, a claim accrues when the plaintiff knew or reasonably should have known

of both his injury and its cause." *Donahue v. United States*, 634 F.3d 615 (1st Cir. 2011) citing

*United States v. Kubrick*, 444 U.S. 111 (1979). Also *Riley v. Presnell*, 409 Mass. 239 (1991),

*Genovesi v. Nelson*, 85 Mass. App. Ct. 43 (2014). This complaint was timely filed.

## PLEADING STANDARD

8       Though this complaint need comply only with notice pleading standards, *Ashcroft v.*

*Iqbal*, 556 U.S. 662 (2009), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Iannacchino v. Ford Motor*, 451 Mass. 623 (2008), it is pled to a higher standard of particularity in order to save the court's resources from being wasted on frivolous boilerplate Rule 12 motions that claim it does not even state a claim or that it is discombobulated and unintelligible and does not provide the defendants adequate notice of what they are being accused of.

BACKGROUND

9       Dr. Welter obtained his doctorate in biochemistry and molecular biology from Oklahoma State University and his M.D. in 1999 from the University of Oklahoma Medical School. He completed his residency in Family Medicine at Brown University Medical School and began his career as a true general practitioner providing outpatient care for all patients - infants to the aged - in the hospital, ICU, and the clinic including full obstetrical care. As his family and his practice grew, and as hospitalist services became more prevalent, Dr. Welter gradually migrated to full outpatient clinical care focusing on providing individual continuing care to his patients in all phases of life.

10      During this time, Dr. Welter grew his single center primary care office to seven locations providing a combination of primary care, urgent care, and occupational health services. Concurrently, beginning sometime in 2005, Dr. Welter began training in cosmetic surgery and hair restoration after witnessing an outstanding transformation in his father's hair after he underwent his own cosmetic hair surgery with another physician. Bridging his background in biochemistry and his familiarity with cellular technology, Dr. Welter became a pioneer in the use of autologous (same self) cell therapy for treatment of hair loss obtaining world-wide renown for

cellular regenerative cosmetic therapies.

11      In 2011, Dr. Welter was the first person to use stem cell therapy derived from adipose tissue to stimulate hair growth with early success and subsequently developed a consistent protocol for male and female pattern hair loss. He founded Regeneris Medical, a biologic research and development company with a core focus on autologous cell based therapies for anti-aging and therapeutic indications with several active clinical trials.

12      Until Dr. Welter was exposed to Dickerson's extortion attempts and actions via both Coverys and a malicious attempt to initiate his own case at the medical licensing board (which failed), Dr. Welter was conducting several clinical trials in the use of cellular therapies for a vast array of treatments including treatments for hair loss but also osteoarthritis and autoimmune diseases. He was the director of a nursing home, continued his primary care practice including care for underserved populations, and remained very involved in the fields of cosmetic surgery and regenerative medicine.

13      Dr. Welter married his college sweetheart, has been married for the past 28 years, and has eight children with two of them currently in college. He has resided in Massachusetts since 2003 after moving from Oklahoma.

14      On October 12, 2017, Dickerson chose to receive hair transplant procedures done by Dr. Welter in his clinic. Dickerson was fully informed about the procedures and options. Initially the result was good and Dickerson was pleased.

15      Beginning in February 2018, Dickerson suffered sudden hair loss on his scalp. On February 6, 2018, Dr. Welter saw him in clinic and diagnosed it as 'shock loss' (*telogen effluvium*) after receiving platelet-rich plasma therapy, a known and rare side effect that had been

fully disclosed to Dickerson. https://www.webmd.com/skin-problems-and-treatments/hair-loss/effluviums

16      Dickerson, who works at Coverys headquarters in Boston, then unlawfully accessed Dr. Welter's confidential file containing privileged Protected Health Information - as defined by the US Department of Health and Human Services based on the Health Insurance Portability and Accountability Act of 1996 (Pub.L. 104–191), the HITECH Act of 2010 (Pub.L. 111-5), and Massachusetts law - that was off-limits to him on Coverys' enterprise data warehouse, a protected computer system, in order to collect HIPAA-privileged medical data that he could use to extort money from Dr. Welter through the threat of public exposure. Dickerson also secretly recorded an oral conversation with Dr. Welter and on February 21, 2018, sent a snippet as an mp3 file via multimedia text from his cellphone to Dr. Welter to reinforce his threat of public exposure. The goal of his overt blackmail attempt was to extort money and free cosmetic procedures from Dr. Welter.

17      On March 5, 2017, Dr. Welter paid Dickerson $4000 conditioned on Dickerson signing a comprehensive release that waived all claims and committed Dickerson to not disparage Dr. Welter in public. Dickerson signed the release and collected the money.

18      Dickerson analyzed confidential patient complaints through his unlawful access in excess of authorization to Dr. Welter's HIPAA-privileged and confidential data held in Coverys' enterprise data warehouse, that was off-limits to him on a protected computer system as defined by 18 USC § 1030. He accessed complaints filed against Dr. Welter with the Board of Registration in Medicine that had not yet been ruled on by the Complaint Committee, meaning they were privileged and exempt from public record requests and from legal discovery. One such

complaint - from two physicians - concerned a reference to a Dr. Tan on Dr. Welter's clinic website.

Hair loss is something that you do not have to live with. Dr. Welter and Dr. Tan believe that all of their patients deserve to look and feel their best no matter which stage of life they are in. If you want to change your life dramatically for the better, contact New England Center for Hair Restoration today!

The Board reached out to Dr. Welter about this, and Dr. Welter immediately, by September 12, 2017, removed any reference to Dr. Tan from his website.

19    Dr. Welter detected Dickerson's violation of Federal law by analyzing the letter from the Board of Registration in Medicine (BORIM) about Dickerson's complaint, which noted:

- In the fall of 2017, you posted inaccurate and misleading information on your website, NEHair, com.  Specifically, you represented that Clark Tan is an experienced physician;

Dickerson first visited Dr. Welter's clinic website on September 30, 2017. By that point there was no way that he could have read anything about Dr. Tan on the website. Fortuitously, the Wayback Machine took a snapshot of Dr. Welter's website that same day. It shows no Dr. Tan.

Hair loss is something that you do not have to live with. Dr. Welter believes that all of their patients deserve to look and feel their best no matter which stage of life they are in. If you want to change your life dramatically for the better, contact New England Center for Hair Restoration today!

Archival snapshots of webpages stored by the Wayback Machine are valid evidence in Massachusetts courts. See *Burlington Police v. Hagopian*, 100 Mass. App. Ct. 720 (2022) Dickerson's claim regarding the reference to Dr. Tan on Dr. Welter's website could have come only from reading an existing complaint that was privileged and exceeded his authorization to access. The data reported by Dickerson about other patient complaints could have come only from the HIPAA-privileged records held in Coverys' electronic database, and not from any other

source. It is revealing that in none of the motions filed by the defendants thus far have they

pointed to any other source. Here is a text message from Dickerson making clear that he had

accessed privileged complaints and that he would make sure to add to the existing complaints in

order to induce action by the Attorney General and the medical board, as he was outraged. These

are Dickerson's own words from his own cellphone laying out his own malicious intent behind

filing a complaint with the medical board.



20    Dickerson's open declaration that filing a complaint that echoed existing complaints would make the drumbeat impossible for BORIM to ignore proved correct and, as a direct result, Dr. Welter lost hundreds of thousands of dollars in addition to massive public contumely and professional harm, exactly as Dickerson intended. After receiving Dickerson's complaint, BORIM did decide that there were many complaints and that some action was necessary. Dickerson's complaint was the straw that broke the camel's back, as he openly declared was his intention. Joseph Dickerson got his malicious revenge via BORIM. After filing his malicious complaint, custom-designed solely to add to the existing complaints that he had read by breaking many laws, Dickerson refused to support his allegations to BORIM with sworn testimony. He would have had to testify how he accessed the data that he had included. But the damage was already done.

21    Coverys' leadership chose to do nothing about Dickerson violating the CFAA, despite being fully informed of Dickerson's violation of federal law. Instead Coverys' leadership retaliated against Dr. Welter by suddenly canceling all malpractice coverage for himself, his clinics and his staff. Coverys shut ALL of Dr. Welter's clinic down overnight while he still held an Active license and before any action by the medical board. It was Coverys alone that did it.

**Disciplinary and/or Massachusetts Criminal Actions**

**Massachusetts Criminal Convictions, Pleas and Admissions**

The Board has no record of felony or serious misdemeanor convictions regarding Dr. Welter.

**Health Care Facility Discipline**

The Board has no record of health care facility discipline regarding Dr. Welter.

**Massachusetts Board Discipline**

Dr. Welter has not been disciplined by the Board.

**Out of State Board Discipline**

The Board has no record of out of state discipline regarding Dr. Welter.

As a direct result, Dr. Welter has been damaged by Coverys to the tune of hundreds of thousands of dollars.

22    In documents filed with this court thus far, Dickerson disingenuously claims that he is being sued for petitioning the government via a board complaint and filed a special SLAPP motion, but does not mention the core complaint - he unlawfully accessed privileged medical data that was off-limits to him and then unlawfully made an audio recording in order to blackmail his victim. Dickerson has now come to this court with unclean hands. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)

<u>CLAIMS FOR RELIEF</u>

<u>COUNT 1</u>
VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 USC § 1030 *et seq*.

23     Dr. Welter re-alleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

24     Coverys utilizes an Enterprise Data Warehouse that functions as a central repository for

all data pertaining to policyholders.

25     This internal protected system is networked to different internal systems that deal with

different processes, such as billing, and is separate from public-facing open websites.

26     Even Coverys' public website has a privacy policy: "Protecting your personal information

is important to us. We maintain administrative, technical, and physical safeguards to help protect

against unauthorized use, disclosure, alteration, or destruction of the personally identifiable

information we collect on or through our Sites."

27     Coverys has in place, pursuant to Federal law, a legally-binding data protection

agreement ("Agreement") termed - HEALTH INSURANCE PORTABILITY AND

ACCOUNTABILITY ACT BUSINESS ASSOCIATE TERMS AND CONDITIONS - and signed

by Defendant Hanson, that is presented to each policyholder. This agreement is a binding

contract between Coverys and the Insured. <u>EXHIBIT 1</u>

28     This Agreement certifies that Coverys would "implement administrative, physical and

technical safeguards that reasonably and appropriately protect" Protected Health Information

entrusted to it and defines a Security Incident as "attempted or successful unauthorized access,

use, disclosure, modification, or destruction of information[.]"

29      Dickerson, a billing manager, had no authorization to access and exfiltrate medical data

from Dr. Welter's confidential file, which contained confidential patient complaints that are

privileged under both federal law Pub.L. 104–191 (HIPAA), and state law. and defined as

Protected Health Information. Per se this was a Security Incident.

30      In addition, Dickerson unlawfully accessed protected off-limits HIPAA-privileged data

for an unlawful purpose, namely economic coercion (blackmail) and a personal vendetta - cash

for himself as well as free cosmetic procedures.

31      It is settled law both in this jurisdiction, and nationwide as of the summer of 2021, that an

employee of Coverys must have both affirmative authority and a lawful purpose to access

specific internal company data about Dr. Welter held on particular files on a protected computer,

*Van Buren v. United States,* 593 U.S. ___ (2021), *or* must access such data for self-help solely to

petition the government for *personal relief* under Title VII, "but only if the employee's actions

are reasonable in the totality of the circumstances." *Verdrager v. Mintz*, 474 Mass. 382 (2016).

Also see *Musacchio v. United States*, 577 U.S. ___ (2016), *EF Cultural Travel v. Zefer Corp.*,

318 F.3d 58 (1st Cir. 2003), *EF Cultural Travel v. Explorica Corp.*, 274 F.3d 577 (1st Cir. 2001),

*iQuartic v. Simms*, 2015 WL 5156558 (D. Mass. 2015), *Creative Computing v. Getloaded. com

LLC*, 386 F.3d 930 (9th Cir. 2004), *Modis, Inc. v. Bardelli*, 531 F. Supp. 2d 314 (D. Conn. 2008),

*SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975 (N.D. CA 2008), *A.V. v. iParadigms,

LLC*, 544 F. Supp. 2d 473 (E.D. VA 2008), *Space Systems/Loral, LLC v. Orbital Atk, Inc.*, 306 F.

Supp. 3d 845 (E.D. VA 2018)

32      The CFAA was written specifically to prohibit **internal threats** such as Dickerson who

willfully exceed authorized access for an improper purpose by using his password to access areas

of Coverys' computer database that were off-limits to him. The law was written for him. The US Supreme Court affirmed this point of law in *Van Buren v. United States,* 593 U.S. ___ (2021): "An individual "exceeds authorized access" when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases— that are off-limits to him."

33     Employee Dickerson fully knew he was in violation of employer policy, Coverys' Business Associate Agreement, and federal law (both HIPAA and CFAA) when he accessed, for an improper ***personal*** purpose, Dr. Welter's privileged patient data - that was off-limits to him - on Coverys' internal protected computer database. *Still v. Commissioner of Employment*, 423 Mass. 805 (1996), *Van Buren* supra

34     It is common knowledge that persons with access to electronic medical data must not access them without specific authorization. This fact has been the subject of numerous news reports when celebrities had their medical records accessed by hospital staff in excess of authorization. https://etactics.com/blog/celebrity-hipaa-violations

35     At minimum, there can be no doubt that Dickerson knew he was deliberately violating HIPAA in order to improperly access PHI for an exclusively personal purpose - his vendetta against Dr. Welter.

36     Dickerson exceeded his authorized access when he accessed Dr. Welter's HIPAA-protected privileged patient complaints file for the express purpose of exfiltrating data that he could then extort Dr. Welter with, which is precisely what he then did.

37     Dickerson violated the CFAA in the exact manner that the Supreme Court in *Van Buren* ruled is a CFAA violation.

38      Because Coverys' Chair and President refused to vindicate the mutual's right to be free of **insider threats** from employees who abuse protected company data for personal profit, Dr. Welter is forced to bring this claim to court himself as a shareholder of Coverys.

39      The statute, 18 USC § 1030, provides that any person damaged by precisely what Dickerson did here, has a private cause of action for suffering a loss ("any reasonable cost to any victim") **_OR_** damage equivalent to $5000 in one year.

40      The loss **_OR_** damage may be calculated in many ways and even in terms of cash-less barter of services in response to the violation. *Space Systems/Loral, LLC v. Orbital ATK, Inc*., 306 F. Supp. 3d 845 (ED Virginia 2018), *United States v. Auernheimer*, 748 F.3d 525 (3rd Cir. 2014), *Animators at Law, Inc. v. Capital Legal Solutions, LLC*, 786 F. Supp. 2d  1114 (E.D. Va. 2011)

41      As a direct result of Dickerson violating the CFAA in order to coerce Dr. Welter into giving him money and free cosmetic procedures, in conscious violation of Dr. Welter's rights under the Massachusetts Civil Rights Act, through intentional causation of severe emotional distress, Dr. Welter's loss *and* damages due to Dickerson's violation of federal law to exfiltrate privileged medical data that he was not authorized to access in the first place are greatly in excess of $5000, including almost $100,000 in legal fees.

42      Dr. Welter was injured by reason of Dickerson's violation of 18 U.S.C. § 1030 and the Defendants' support for a blackmailer.

43      The Defendants have engaged in the commission of malicious, willful, and consciously wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Welter is entitled to and must be awarded punitive damages against each of the Defendants.

44    Plaintiff Dr. Welter seeks from all defendants damages of $9 million, punitive damages in

an amount to be determined at trial by the jury, and reasonable costs and attorney's fees, for

Dickerson's violation of 18 U.S.C. 1030.


COUNT 2
UNLAWFUL WIRETAPPING

VIOLATION OF MASSACHUSETTS WIRETAP STATUTE, G.L.c. 272 § 99,
AND 18 U.S.C. 2520

45    Dr. Welter re-alleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

46    The requirement in Massachusetts that both parties to a conversation must consent to an

audio recording of the conversation is common knowledge. It is also common knowledge that

Massachusetts has prosecuted people for secretly taping conversations. https://

www.berkshireeagle.com/archives/secretly-recording-someone-doesnt-fly-under-massachusetts-

law/article_10078f89-d993-5b9c-8072-87a3ff3698fb.html

47    This issue is in the news fairly frequently in Massachusetts and is not something out in

the weeds that only legal scholars are privy to. Already back in 2015 a driver took care to inform

a misbehaving Medford police officer at the outset that a dashcam was recording their encounter

- https://www.boston.com/news/local-news/2015/07/27/cop-caught-on-dash-cam-threatening-to-

blow-a-hole-through-drivers-head

48    Dickerson secretly taped an oral conversation with Dr. Welter in two-party

Massachusetts, then sent an mp3 file of the recording as a multimedia message from his

cellphone to Dr. Welter's cellphone, in order to blackmail Dr. Welter to pay him enough money

to be happy, in addition to free cosmetic procedures.

49    Dickerson violated section 99. Dr. Welter is entitled under state law to collect civil

damages from Dickerson for this violation and does not need to prove that this violation was

intentional. *Pine v. Rust*, 404 Mass. 411 (1989)

50    Dickerson further violated Title III of the Omnibus Crime Control and Safe Street Act of

1968 (Wiretap Act). Dr. Welter is further entitled to collect civil damages from Dickerson under

federal law. *Williams v. Poulos*, 11 F.3d 271 (1st Cir. 1993), *Desilets v. Wal Mart Stores, Inc.*, 171

F.3d 711 (1999)

> 18 U.S.C. 2520. Recovery of civil damages authorized:  (a) In general. Except as
> provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic
> communication is intercepted, disclosed, or intentionally used in violation of this chapter
> may in a civil action recover from the person or entity other than the United States which
> engaged in that violation such relief as may be appropriate.

51    Dr. Welter informed Coverys of Dickerson's violation of the Massachusetts wiretap

statute, and his attempt to blackmail Dr. Welter.

52    Coverys, under the "leadership" of Richardson and Hanson, for reasons expected to be

revealed by discovery, chose to support a blackmailer and retaliated against Dr. Welter instead,

by furthering Dickerson's false narrative about Dr. Welter's integrity and moral character and

keeping Dickerson on as an employee and supporting him financially to this day.

53    The Defendants have engaged in the commission of malicious, willful, and consciously

wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Welter is

entitled to and must be awarded punitive damages against each of the Defendants.

54    Plaintiff Dr. Welter seeks from all defendants damages of $9 million, punitive damages in

an amount to be determined at trial by the jury, and reasonable costs and attorney's fees, for

Dickerson's violation of both section 99 and 18 U.S.C. 2520.

COUNT 3

ECONOMIC COERCION IN VIOLATION OF G. L. c. 12, §§ 11**H**, 11**I**

55     Dr. Welter re-alleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

56     The right of persons in the United States to enjoy life, liberty and the pursuit of happiness

is a fundamental principle. The Bill of Rights documented certain of the rights inherent in the

people that must not be violated anywhere within the United States. Massachusetts passed a

comprehensive law that protects the civil rights of persons living in this state. Dr. Welter is a

person living in this state. He is a physician duly licensed by the state and possesses advanced

degrees, and training in hair transplant procedures and VASER liposuction.

57     Dr. Welter has the constitutionally-protected right to earn a living as a physician. *Truax v.*

*Raich*, 239 US 33 (1915)

58     Dickerson, an employee of an insurance company, unlawfully accessed Dr. Welter's

privileged electronic records held at Coverys in order to find some HIPAA-protected information

that he could then use to coerce Dr. Welter into providing free cosmetic services and cash for

Dickerson personally, under the overt threat of public contumely (including use of secret audio

recordings) and professional consequences for Dr. Welter should he fail to pay.

59     Directly as a result of Dickerson's misappropriation of Dr. Welter's trade secrets and

using them to subject Dr. Welter to economic coercion in violation of G. L. c. 12, §§ 11H, 11I,

Dr. Welter has been severely injured.

60     Coverys, under the "leadership" of Richardson and Hanson, for reasons expected to be

revealed by discovery, chose to aid and abet the blackmail and violation of Dr. Welter's civil

rights by its treasured employee.

61     The Defendants have engaged in the commission of malicious, willful, and consciously

wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Welter is

entitled to and must be awarded punitive damages against each of the Defendants.

62     Dr. Welter is entitled by law to a private cause of action and seeks damages of $9 million,

punitive damages as determined by a jury at trial, pre- and post judgment interest, reasonable

costs and attorney's fees from the Defendants for Dickerson's conscious violation of the

Massachusetts Civil Rights Act and Coverys' active ongoing support for this violation.

COUNT 4
VIOLATION OF THE MASSACHUSETTS TRADE SECRET ACT, ch. 93 § 42-42G
AND DTSA 18 U.S.C. § 1836

63     Dr. Welter re-alleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

64     In Massachusetts, a "plaintiff must demonstrate: (1) that the information is, in fact, a

trade secret; (2) that the plaintiff took reasonable steps to preserve the secrecy of the information;

and (3) the defendant used improper means to acquire the information. See Data General Corp. v.

Grumman Systems Support Corp., 36 F.3d 1147, 1165 (1st Cir. 1994); J.T. Healy & Son, Inc. v.

James A. Murphy & Son, Inc., 357 Mass. 728, 737-39 (1970)" iRobot Corp. v. Ahed, No. 07-

cv-11611-NG (D. Mass. Nov. 2, 2007), Optos, Inc. v. Topcon Medical Systems, Inc., 777 F.

Supp. 2d 217 (D. Mass. 2011)

65     In 2018 Massachusetts passed ch. 93 § 42-42G, and Congress passed the Defend Trade

Secrets Act, 18 U.S.C. § 1836. Chapter 93 Section 42 enforces the following definitions

        "Improper means", includes, without limitation, theft, bribery, misrepresentation,

18

unreasonable intrusion into private physical or electronic space, or breach or inducement of a breach of a confidential relationship or other duty to limit acquisition, disclosure or use of information; reverse engineering from properly accessed materials or information is not improper means.

"Misappropriation", (i) an act of acquisition of a trade secret of another by a person who knows or who has reason to know that the trade secret was acquired by improper means

66      Both definitions apply squarely to what Dickerson did regarding Dr. Welter's HIPAA-privileged Protected Health Information regarding his list of patients on Coverys' computer database. Coverys' Agreement also includes patient names and addresses as PHI.

67      A physician's patient list is a trade secret and has been so recognized for years. *US Bioservices Corp. v. Lugo*, 595 F. Supp. 2d 1189 (D. Kan. 2009), *In re American Preferred Prescription v. Health Management Inc.*, 186 B.R. 350 (E.D.N.Y. 1995), *In re Phoenix Dental Systems, Inc. v. Phoenix Dental Systems, Inc.*, 144 B.R. 22 (W.D. Pa. 1992), *Damf v. Bloom*, 127 A.D. 2d 719 (NY 1987), *Dickinson Medical Group, P.A. v. Foote*, 1984 WL 8208 (Del. Ch. 1984) (unpublished), *ReadyLink Healthcare v. Cotton*, 24 Cal.Rptr.3d 720 (2005), *Central Valley General Hospital v. Smith*, 162 Cal. App. 4th 501 (Cal. Ct. App. 2008), *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc*. 556 F.Supp.2d 1122 (E.D. Cal. 2008), *Hoppens v. Haugen*, No. A-98-0802 (Neb.App.Ct. 1999).

68      The ABA Journal reported in its newsletter almost twenty (20) years ago (Vol. 6, 2003):

"Patient lists are natural candidates for protection as trade secrets: they consist of patient data that are not readily ascertainable to the outside world; they derive economic value to the medical practices by containing valuable contact information; and all practices take great care to protect them. In almost all cases, such lists may be accessible only to a select number of employees and also password protected for computer access."

69      Patient information that could affect Dr. Welter's clinic business or his professional status is a trade secret that is protected by law and may be divulged only to authorized persons for

legitimate purposes, such as public health officials, the patient's insurance carrier, Dr. Welter's

malpractice insurance carrier, and, pursuant to a signed court order, law enforcement agencies.

70     The plaintiff here, Dr. Welter, took all reasonable steps to protect his trade secrets. There

have been no leaks or breaches from his side. The sole breach occurred within Coverys, where

Dickerson misappropriated Dr. Welter's trade secrets for an improper ***personal*** purpose.

71     Coverys was officially informed that its employee Dickerson had committed this

unlawful breach, both by Dr. Welter and in a later pre-litigation demand letter sent by Dr.

Welter's then-attorney Frank Dimento Jr.. <u>EXHIBIT 2</u> Coverys made plain it supported

Dickerson and did not care about him violating the CFAA and Trade Secrets Acts. <u>EXHIBIT 3</u>

72     In addition, Coverys, under the "leadership" of Chair Richardson and CEO Hanson,

rewarded Dickerson by allowing him to continue employment unchanged in any way and by

sending Dr. Welter invoices that, until Coverys falsely canceled his policy, emphasized the fact

that Dickerson **remained** as the billing specialist assigned to his account.



**COVERYS**

*Premium Invoice – Page 1 of 2 pages*

| | | |
|---|---|---|
| Ryan J Welter, MD | Invoice Number | 0010001681556 |
| 485 S Washington Street | Invoice Date | 03/27/2020 |
| North Attleboro, MA 02760 | Due Date | 04/28/2020 |
| | Policy Number | 001MA000014841 |
| | Policy Period | 09/01/2019 - 09/01/2020 |

Insured Ryan J Welter, MD

| | | |
|---|---|---|
| Renewal | 09/01/2019 - 09/01/2020 | $12,264.00 |
| Endorsements | | ($1,062.00) |
| Payments Received to Date | | ($7,449.34) |
| Installment Fee* | | $257.74 |
| 2019 Policyholder Dividend** | | ($1,212.90) |
| Option 1 – Payment in Full – Premium | | $2,801.50 |
| | | $2,801.50 |
| Option 2 – Installments - Premium | | $2,801.50 |
| | | $2,801.50 |

* All payments are allocated to Surcharges and Taxes first, then Premium.

Agent: Lukatsky Insurance Group
200 Reservoir St
Ste 306
Needham, MA 02494

For billing questions, please contact Joe Dickerson at
1-800-225-6168 ext. 5295.

73      Directly as a result of Dickerson's misappropriation of Dr. Welter's trade secrets and his using them to subject Dr. Welter to economic coercion, Dr. Welter has been severely injured.

74      These injuries to Dr. Welter were a direct, proximate, reasonably foreseeable and intentional result of the violations of ch. 93 § 42-42G and 18 U.S.C. § 1836.

75      Dr. Welter is entitled by law to a private cause of action for the misappropriation of his trade secrets and the Defendants' common disregard for unauthorized disclosure.

76      The Defendants have engaged in the commission of malicious, willful, and consciously wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Welter is entitled to and must be awarded punitive damages against each of the Defendants.

77      Defendants Dickerson, Hanson, Richardson and Coverys must be held liable for damages to Dr. Welter with an initial demand of $9 million and a final amount, including punitive damages, to be determined by a jury at trial. Dr. Welter also demands all costs and attorney's fees and pre- and post-judgment interest from the Defendants, and requests such other and further relief as this court may deem just and proper.


<u>COUNT 5</u>
BREACH OF CONTRACT

78      Dr. Welter re-alleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

79      By aligning with Dickerson's violation of major laws and his false narrative regarding Dr. Welter's integrity and moral character, Richardson, Hanson and Mutual have breached the contract they made with Dr. Welter [1] to comply with Federal law and ensure protection for his privileged and confidential data and [2] in the form of his malpractice insurance policy.

80     Despite Coverys' later claims to the contrary in motions to this court, Coverys entered into a legally-binding contract - the Agreement - with Dr. Welter and accepted that Coverys had the _**duty**_ to protect PHI in its care and that it would comply with Federal and state law as soon as it is made aware of any Security Incidents regarding any breach of its database.

81     "Legally-bound" is subject to only one interpretation.

82     It is beyond dispute that Dickerson caused a Security Incident as defined within the Agreement, that Dr. Welter informed Coverys of the Security Incident, and that Coverys declared that Dickerson had done no wrong. There is zero evidence that Coverys complied with the Agreement in any way and it has thus far presented no evidence in its various motions to this court that it does anything to protect privileged medical data or punish access in excess of authorization by internal threat actors. As a shareholder, Dr. Welter finds this fact very alarming.

83     Discovery is expected to reveal the underlying reason for the choice made by Hanson, Richardson and Coverys to support Dickerson's blackmail and do nothing to comply with the Agreement.

84     The Defendants have engaged in the commission of malicious, willful, and consciously wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Welter is entitled to and must be awarded punitive damages against each of the Defendants.

85     Defendants Dickerson, Hanson, Richardson and Mutual must be held liable for damages to Dr. Welter with an initial demand of $9 million and a final amount, including punitive damages, to be determined by a jury at trial. Dr. Welter also demands all costs and attorney's fees and pre- and post-judgment interest from the Defendants, and requests such other and further relief as this court may deem just and proper.

COUNT 6
NEGLIGENT SUPERVISION OF EMPLOYEE

86    Dr. Welter re-alleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

87    An employer may owe a duty of reasonable care to a plaintiff "when the employment

facilitates the employee's causing harm to third parties." Employment is said to facilitate harm to

others "when the employment provides the employee access to physical locations, such as the

place of employment, or to instrumentalities . . . or other means by which to cause harm that

would otherwise not be available to the employee." Restatement (Third) of Torts: Liability for

Physical and Emotional Harm § 41 (2012) ("Duty to Third Parties Based on Special Relationship

with Person Posing Risks") (§ 41) at § 41(b)(3).

88    The instrumentality in Dickerson's case is Coverys' enterprise data warehouse which

allowed him to unlawfully access, in excess of authorization, Dr. Welter's confidential and

HIPAA-privileged records that are protected trade secrets and not available willy-nilly to the

general public. They were off-limits to Dickerson who is just a billing manager and not

authorized to access privileged patient complaints using his Coverys password, just as hospital

staff are not authorized to read the medical charts of patients not directly under their care (such

as celebrities).

89    ***BUT FOR*** Dickerson being Coverys' employee, he would not have had ***any*** access.

*Doull v. Foster*, 487 Mass. 1 (2020)

90    The CFAA, HIPAA, and the Business Agreement imposed on Richardson, Hanson and

Coverys a legally-binding ***duty of care*** to ensure any and all access to privileged medical data

(PHI) data held by Coverys' enterprise data warehouse was authorized and for a legitimate business purpose related to Coverys' own business activities.

91    Coverys' claim, in its motion to dismiss the amended complaint, that Dickerson is "an independent bad actor" and that Coverys had no duty under the Agreement to safeguard PHI, would be laughable were it not outrageously deceptive. Coverys has come to this court with unclean hands. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)

92    That Dickerson chose to violate the CFAA and the Trade Secret Acts does not indemnify Richardson, Hanson and Coverys because of their support for Dickerson's blackmail subsequent to being made aware of Dickerson's violation of federal law and attempt to blackmail Dr. Welter.

93    Any jury is highly likely to find that Richardson, Hanson and Coverys are guilty, at minimum, of negligent supervision.

94    The Defendants have engaged in the commission of malicious, willful, and consciously wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Welter is entitled to and must be awarded punitive damages against each of the Defendants.

95    Defendants Dickerson, Hanson, Richardson and Coverys must be held liable for damages to Dr. Welter with an initial demand of $9 million and a final amount, including punitive damages, to be determined by a jury at trial. Dr. Welter also demands all costs and attorney's fees and pre- and post-judgment interest from the Defendants, and requests such other and further relief as this court may deem just and proper.

<u>COUNT 7</u>
UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF CHAPTER 93A

96    Dr. Welter re-alleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

97      Richardson, Hanson and Covers (an insurance company engaged in trade or commerce) actively aligned themselves with Dickerson, aided and abetted him, and subjected Dr. Welter to further gross unfairness and character defamation by falsely misrepresenting that these Defendants canceled his malpractice policy only because of *his* failure to disclose that his license was Revoked/Suspended, when his license had not been Revoked or Suspended at the time.

98      In its motion to dismiss the amended complaint, pg.13, Coverys makes the cute argument that because Dr. Welter voluntarily agreed to not practice medicine, his license was "in effect" suspended.

99      Naturally, this claim flies in the face of the specific meaning for "suspended license" and "revoked license" which in the context of license regulation invariably indicates action by a regulatory authority.

100     In Massachusetts, insurance agents and advisers must be licensed by the Commonwealth. Here is the exact language employed by the Commonwealth:

> The requirements for advisers are governed by M.G.L. c. 175 §177A and §177B. To become an insurance adviser in the Commonwealth, applicants must meet the following requirements:
>
> - The applicant must pass the adviser licensing examination administered by Prometric. Contact Prometric at http://www.prometric.com or call 800-741-9380 to schedule your written examination.
>
> - The applicant must be least eighteen (18) years of age.
>
> - No insurance license **issued to** the applicant **has ever been revoked or suspended**.

- The applicant is trustworthy and competent.

https://www.mass.gov/service-details/licensing-requirements-adviser-individual

101    It is settled law that *suspended* or *revoked* refers solely to state regulatory action and not individuals' personal actions. The language used by the Commonwealth above, referring to insurance professionals, does not in any way lend itself to any meaning other than 'someone in authority who issued that license has revoked or suspended the licensee's license to sell insurance policies.'

102    Coverys misled the court in its motion to dismiss on a crucial point - Did Dr. Welter fail to disclose that the Board of Registration in Medicine had suspended his license at the time that Coverys suddenly canceled the policies for both himself **and** his clinic and made it impossible for his clinic to function? Yes, Coverys attempted to deceive the court on this point.

103    Physicians and other licensed professionals suddenly stop practicing when injured in a traffic accident or following a diagnosis of cancer. Absolutely no licensed professional in the real world considers their license to have been suspended or revoked.

104    Coverys' motion to this court itself is undeniably deceptive, and intended to deceive this court and misdirect it away from the fact that the evidence is unequivocal that Dr. Welter did not conceal any suspension or revocation of his license that had been ordered by the state medical board as no order had been issued by any regulatory authority at the time Coverys acted.

105    Coverys' letter in response to Dr. Welter's pre-litigation demand letter was a separate deceptive act done in bad faith. In it Coverys denied that a Security Incident had even occurred or that PHI had been exfiltrated. Coverys fully knows that Dickerson violated the CFAA through access in excess of authorization, and ***conceded*** that Dickerson had not been authorized to access

the Protected Health Information in Dr. Welter's confidential medical patient file, but in a breathtaking act of conscious deception, strove in its response letter to minimize the gravity of the Security Incident, gave the false impression that Dickerson's breach "relat[ed] to Dr. Welter's policies" and that Coverys had, "out of an abundance of caution," asked him to not do it again.

> "While Mr. Dickerson is not, and never has been, assigned to the accounts related to Dr. Welter, out of an abundance of caution Coverys has instructed Mr. Dickerson not to access those accounts and to refer any requests for assistance relating to Dr. Welter's policies to his manager without delay. Mr. Dickerson's supervisors have been informed of the conflict and asked to ensure that Mr. Dickerson does not access or work on accounts related to Dr. Welter." EXHIBIT 3

106    When Coverys unexpectedly canceled the policies held by everyone at Dr. Welter's clinic - and not just Dr. Welter - it was intentional collective punishment and retaliation for having informed Coverys of a serious Security Incident, and aimed at disparaging the credibility of the person who raised the alarm and punishing him for having done so.

107    By unilaterally canceling Dr. Welter's malpractice insurance policy on the basis of a consciously and provably-false allegation of lack of candor, Richardson, Hanson and Coverys breached both a contract and the covenant of good faith and fair dealing - ***after*** being made aware of Dickerson's violation of Federal law and Coverys' Business Agreement. This was a second deceptive act done in bad faith.

108    The net result of both acts was severe disruption of Dr. Welter's business, loss of income for both himself and other staff working in his clinic, loss of reputation amongst patients who were forced to wonder what was going on when appointments and procedures scheduled with

other physicians in the clinic were suddenly canceled in the absence of any action by the state

medical board against those other physicians. This also meets the Massachusetts standard for

tortious interference with advantageous business relations - between Dr. Welter and his patients -

because it was caused by Coverys's deceptive claim that Dr. Welter's license had been revoked

or suspended prior to Coverys suddenly canceling its policies for the whole clinic. *Cherick v.*

*Polar*, 41 Mass. App. Ct. 125 (1996)

109    Liability here is incurred by the insurance company due to the unlawful actions of ***its own***

***employee - a person under its control*** - as well as by its Chair and CEO aiding and abetting ***their***

***employee***. Coverys' claim that Dickerson is "an independent bad actor" is intentionally false.

*Sandman v. Quincy Mutual*, 81 Mass. App. Ct. 188 (2012)

110    It is disingenuous to claim that Coverys lacks liability because Dr. Welter did not have a

separate insurance policy covering breaches of the Coverys Business Agreement, or that

precedent applies only to cases involving a Third Party and not the insured himself.

111    This complaint more than plausibly alleges that Dr. Welter lost money or property

directly as a result of the defendants' unfair and deceptive acts that this complaint describes in

detail. Dr. Welter has not brought this case as a "self-appointed Attorney General." *LimoLiner,*

*Inc. v. Dattco, Inc.*, 919 F.3d 86 (1st Cir. 2019)

112    It is for a jury to determine whether the Defendants' actions were unfair and deceptive,

after discovery of all the facts in this dispute. *Synergistics v. Putnam*, 74 Mass. App. Ct. 686

(2009) There is no previous case in Massachusetts with the facts in this complaint and so the 93A

count may not be dismissed "as a matter of law." There is no case law.

113    From 1996 onwards, mutual insurance companies are liable under ch. 93A in

Massachusetts courts. *Wheatley v. Mass. Insurers Insolvency Fund*, 456 Mass. 594 (2010)

114    The Defendants have engaged in the commission of malicious, willful, and consciously

wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Welter is

entitled to and must be awarded punitive damages against each of the Defendants.

115    Defendants Dickerson, Hanson, Richardson and Coverys must be held liable for damages

to Dr. Welter with an initial demand of $9 million and a final amount, including punitive

damages and treble damages, to be determined by a jury at trial. Dr. Welter also demands all

costs and attorney's fees and pre- and post-judgment interest from the Defendants, and requests

such other and further relief as this court may deem just and proper.


<u>COUNT 8</u>
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

116    Dr. Welter re-alleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

117    "To prevail on a claim of intentional infliction of emotional distress, a plaintiff "must
establish '(1) that the defendant intended to inflict emotional distress, or knew or should
have known that emotional distress was the likely result of his conduct, . . . (2) that the
defendant's conduct was extreme and outrageous, beyond all possible bounds of decency,
and utterly intolerable in a civilized community, (3) [that] the actions of the defendant
were the cause of the plaintiff's distress, and (4) [that] the emotional distress suffered by
the plaintiff was severe and of such a nature that no reasonable person could be expected
to endure it.' " <u>Quinn v. Walsh</u>, 49 Mass. App. Ct. at 706, quoting from <u>Tetrault v.
Mahoney, Hawkes & Goldings</u>, 425 Mass. 456 , 466 (1997)."
*Conley v. Romeri*, 60 Mass. App. Ct. 799 (2004)

118    This complaint has already documented that Dickerson deliberately set out to cause

severe emotional distress in Dr. Welter through the use of HIPAA-privileged and confidential

data exfiltrated from Coverys' enterprise data warehouse in violation of the CFAA, through

secret audio recordings, ensuring that Dr. Welter knew that secret recordings of his conversations exist, and causing Coverys to breach its contract with Dr. Welter and to accuse him of lack of integrity and candor while causing him financial and reputational harm.

119    Dickerson fully intended to inflict severe emotional distress upon Dr. Welter and did inflict severe emotional distress upon Dr. Welter and his entire family, who all remain anguished and staggered that a Coverys employee can snoop through protected medical information with total impunity, and at Coverys' false accusation in response that Dr. Welter misled Coverys.

120    Despite the total absence of even a suggestion of substandard medical care, Dr. Welter has been severely damaged. *Telogen effluvium*, which is what Dickerson experienced, happens also to people who have never had any hair transplant procedures, and Dickerson is not justified on any level for any and all of his actions. Coverys is not justified in backing Dickerson all the way, as it has done.

121    Neither Dr. Welter nor his family deserved what Dickerson chose to inflict upon them. It is staggering to be threatened by a blackmailer.

122    It was further devastating to witness Richardson, Hanson and Coverys gang up with Dickerson and against Dr. Welter, instead of providing him help and relief in his time of need. Isn't that the basic contract between a consumer and an insurance company? Do we expect the insurance company to aid and abet the perpetrator destroying our lives? That is precisely what happened here.

123    The actions by Dickerson and the actions in his support by Hanson, Richardson and Coverys meet all four criteria set in *Tetrault*. Only exemplary punitive damages shall deter such behavior in the future. The law takes blackmail seriously. http://archive.boston.com/news/local/

massachusetts/articles/2009/02/21/judge_accepts_plea_deal_in_sex_case/

124     Discovery is expected to reveal the underlying reason for the choice made by Hanson, Richardson and Coverys to support Dickerson and aid him in applying further pressure on and cause severe distress to Dr. Welter, and what advantage they enjoy from having a blackmailer working for them in their insurance company.

125     The Defendants have engaged in the commission of malicious, willful, and consciously wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Welter is entitled to and must be awarded punitive damages against each of the Defendants.

126     Defendants Dickerson, Hanson, Richardson and Coverys must be held liable for damages to Dr. Welter with an initial demand of $9 million and a final amount, including punitive damages, to be determined by a jury at trial. Dr. Welter also demands all costs and attorney's fees and pre- and post-judgment interest from the Defendants, and requests such other and further relief as this court may deem just and proper.

PRAYER FOR RELIEF

Based on the above complaint, Dr. Welter prays that this court grant the relief requested

for each count in this complaint, after the finding of facts by a jury, monetary damages as

determined by a jury at trial, double or treble damages under MGL ch. 93A, and any further

relief as this court may deem just and proper.

Signed under the pains and penalties of perjury,

April 12, 2022              /s/ Ryan Welter M.D, Ph.D
                           _____
                           RYAN WELTER M.D., Ph.D., *pro se*
                           465 South Washington Street
                           North Attleboro MA 02760
                           tel: 508 345 5492
                           email: r.welter@regenerismedical.com

# EXHIBIT 1



## HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT
## BUSINESS ASSOCIATE TERMS AND CONDITIONS

WHEREAS, the Administrative Simplification section of the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act and their implementing regulations as amended from time to time (collectively, "HIPAA") establishes federal requirements for the use, disclosure, and security of individually identifiable health information;

WHEREAS, HIPAA requires health care providers to enter into written agreements or other arrangements with Business Associate(s) that govern the Business Associate's use and/or disclosure of individually identifiable health information;

WHEREAS, the Insured, a health care provider, is seeking, or has obtained, insurance coverage from one of the companies identified above (the "Company");

WHEREAS, many states have implemented laws that establish certain requirements governing the protection of personal information of state residents ("Personal Information"), some of which may be applicable to the Company;1

WHEREAS, in connection with the Insured obtaining or maintaining such insurance coverage, or in connection with the Insured obtaining benefits under such insurance coverage, the Insured may disclose Protected Health Information, including Electronic PHI (each as defined herein), and/or Personal Information to the Company;

WHEREAS, pursuant to HIPAA, the Company is a Business Associate of Insured when Company receives, creates, maintains uses, discloses or transmits Insured's Protected Health Information, including Electronic PHI, on behalf of Insured in the performance of services provided in connection with Company's provision of insurance coverage to Insured; and

WHEREAS, the Company desires to enter into or amend and restate, as the case may be, a Business Associate agreement (this "Agreement") in favor of the Insured on the terms and conditions set forth herein, pursuant to HIPAA, to govern the Company's use and disclosure of Protected Health Information, including Electronic PHI, received directly from, or received on behalf of, the Insured.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company hereto agrees as follows:

1.     **Definitions.** Capitalized terms used in this Agreement that are not defined in this Section 1 or elsewhere in this Agreement shall have the respective meanings assigned to such terms in the

---

1 For example, many states define Personal Information as first name and last name or first initial and last name in combination with any one or more of the following data elements that relate to such resident: (a) Social Security number; (b) driver's license number or state-issued identification card number; or (c) financial account number, or credit or debit card number, with or without any required security code, access code, personal identification number or password, that would permit access to a resident's financial account; provided, however, that "Personal information" does not include information that is lawfully obtained from publicly available information, or from federal, state or local government records lawfully made available to the general public.

One Financial Ctr • Boston, MA 02111 • USA • +1 800.225.6168 **coverys.com**

Medical Professional Mutual Insurance Company • Preferred Professional Insurance Company® • ProSelect Insurance Company®

Administrative Simplification section of HIPAA.  The following terms shall have the meanings ascribed thereto for purposes of this Agreement:

**"Electronic PHI"** means Protected Health Information which is transmitted by Electronic Media or maintained in Electronic Media.

**"Insured"** means the first named insured and any other insureds as defined under the coverage provided by the Company or the first applicant listed on the application and any other applicants seeking coverage under the same application, provided however, that neither this definition nor this agreement should be construed as an offer of coverage.

"**Protected Health Information"** means information that:

(i)    relates to the past, present or future physical or mental health or condition of an Individual, the provision of health care to an Individual, or the past, present or future payment for the provision of health care to an Individual, and (a) identifies the Individual, or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the Individual;  and

(ii)    the Company (a) has received from the Insured, or (b) has received on behalf of the Insured.

"**Representatives"** means with respect to the Company or the Insured, as the case may be, its affiliates, managers, trustees, directors, officers, controlling persons, members, shareholders, employees, producers (including brokers and agents), advisors (including but not limited to accountants, attorneys and financial advisors) and other representatives.

**"Security Incident"** means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.

**"Services"** include, without limitation, the business management and general administrative activities of the Insured (including the provision of professional liability insurance coverage, placing stop-loss and excess of loss or re-insurance, receiving and evaluating incidents, claims, and lawsuits relating to such insurance coverage, and providing data analyses for the Insured); conducting quality assessment and quality improvement activities, including outcomes evaluation and the development of clinical guidelines and loss prevention tools; reviewing the competence or qualifications of the Insured's health care professionals; evaluating the Insured's practitioner and provider performance; conducting training programs to improve the skills of the Insured's health care practitioners and providers; conducting credentialing activities; conducting or arranging for medical review; arranging for legal services; and resolution of internal grievances.

2.    **HIPAA Amendments.**  The parties acknowledge and agree that the Health Information Technology for Economic and Clinical Health Act and its implementing regulations impose requirements with respect to privacy, security and breach notification applicable to Business Associates (collectively, the "HITECH BA Provisions").  The HITECH BA Provisions and any other future amendments to HIPAA affecting Business Associate agreements are hereby incorporated by reference into this Agreement as if set forth in this Agreement in their entirety, effective on the later of the effective date of this Agreement or such subsequent date as may be specified by HIPAA..

3.    **Obligations of the Company.**  The Company shall not use or disclose Protected Health Information other than as permitted in accordance with the terms of this Agreement.

    (a)    **Permitted Purposes for Use and/or Disclosure of Protected Health Information.**  The Company shall not use or disclose Protected Health Information received from the Insured in any manner that would constitute a violation of HIPAA if so used or disclosed by the Insured. To the extent that the Company carries out any of the Insureds obligations under the HIPAA privacy standards, the Company shall comply with the requirements of the HIPAA privacy standards that apply to the Insured in the performance of such obligations.  The Company may only:

        (i)    use and/or disclose Protected Health Information in providing the Services to the Insured in connection with the Insured obtaining and maintaining any insurance coverage offered by the Company, including the Insured obtaining any benefits under such insurance coverage;

        (ii)    use Protected Health Information for the provision of data aggregation services relating to the Health Care Operations of the Insured;

        (iii)    use Protected Health Information for the proper management and administration of the Company;

        (iv)    disclose Protected Health Information to a third party for the Company's proper management and administration, provided that the disclosure is Required by Law or the Company obtains reasonable assurances from the third party to whom the Protected Health Information is to be disclosed that the third party will (a) protect the confidentiality of the Protected Health Information, (b) only use or further disclose the Protected Health Information as Required by Law or for the purpose for which the Protected Health Information was disclosed to the third party and (c) notify the Company of any instances of which the person is aware in which the confidentiality of the Protected Health Information has been breached;

        (v)    "de-identify" Protected Health Information or create a "limited data set," and to use "de-identified" information in a manner consistent with and permitted by HIPAA;

        (vi)    use Protected Health Information to carry out the legal responsibilities of the Company;

        (vii)    disclose Protected Health Information as Required by Law;

        (viii)    to the extent required by the "minimum necessary" requirements of HIPAA, request, use and disclose the minimum amount of Protected Health Information necessary to accomplish the purpose of the request, use or disclosure; and

        (ix)    use and/or disclose Protected Health Information as otherwise agreed to in writing by the Insured.

    (b)    **Safeguards Against Misuse of Information.**  The Company agrees that it will use appropriate safeguards to prevent the use or disclosure of Protected Health Information in a manner contrary to the terms and conditions of this Agreement and will implement administrative, physical and technical safeguards that reasonably and appropriately protect the Confidentiality, Integrity and Availability of Electronic PHI that the Company creates, receives, maintains, or

transmits on behalf of the Insured. The Company shall comply with the HIPAA Security Rule with respect to Electronic PHI.

(c) **Reporting of Improper Disclosures of PHI.**

(i)    If the Company becomes aware of a use or disclosure of Protected Health Information in violation of this Agreement by the Company or a third party to which the Company disclosed Protected Health Information, the Company shall report the use or disclosure to the Insured without unreasonable delay.

(ii)    The Company shall report any Security Incident involving Protected Health Information of which it becomes aware in the following manner:  (a) any actual, successful Security Incident will be reported to the Insured in writing without unreasonable delay, and (b) any attempted, unsuccessful Security Incident directly affecting a system that stores Protected Health Information of which the Company becomes aware will be reported to the Insured orally or in writing on a reasonable basis, as requested by the Insured.  If the HIPAA security regulations are amended to remove the requirement to report unsuccessful attempts at unauthorized access, the requirement hereunder to report such unsuccessful attempts will no longer apply as of the effective date of the amendment.

(iii)    The Company shall: (a) following the discovery of a Breach of Unsecured Protected Health Information, notify the Insured of the breach without unreasonable delay and in no case later than 60 days after discovery of the breach; and (b) following a breach of Personal Information under any applicable state law, provide any required notifications in accordance with such law.

(d) **Subcontractors.**

(i)    Except as otherwise provided herein, the Company shall enter into a written agreement meeting the requirements of 45 C.F.R. §§ 164.504(e) and 164.314(a) (2) with each Subcontractor (including, without limitation, a Subcontractor that is an agent under applicable law) that creates, receives, maintains or transmits Protected Health Information on behalf of the Company. The Company shall ensure that the written agreement with each Subcontractor obligates the Subcontractor to comply with restrictions and conditions that are at least as restrictive as the restrictions and conditions that apply to the Company under this Agreement.

(ii)    With respect to any third party to whom the Company discloses Protected Health Information for a purpose described in Section 3(a)(iii) or 3(a)(v) of this Agreement, the Company shall obtain reasonable assurances from such third party that the Protected Health Information will be held confidentially and will be used or further disclosed only as required by law or for the purpose for which the Company disclosed the Protected Health Information to the third party and that it will implement reasonable and appropriate safeguards to protect it.  In addition, such third party shall agree to notify the Company of any instances of which it is aware in which the confidentiality of the information has been breached.

(e) **Access to Information.**  In the event that the Company receives a written request by the Insured for access to Protected Health Information about an Individual contained in any Designated Record Set of the Insured maintained by the Company, the Company shall, in a timely manner in order to permit the Insured to comply with its obligations under HIPAA, make

available to the Insured such Protected Health Information. This obligation shall continue only for so long as such information is maintained by the Company. In the event that any Individual requests access to Protected Health Information pertaining to such Individual directly from the Company, the Company shall forward such request to the Insured. The provision of access to the Individual of such Protected Health Information and/or denial of the same (including the creation and/or maintenance of any notifications and/or documents in connection therewith) shall be the sole responsibility of the Insured.

(f) **Availability of Protected Health Information for Amendment.** In the event that the Company receives a written request from the Insured for the amendment of an Individual's Protected Health Information contained in a Designated Record Set of the Insured maintained by the Company, the Company shall, in a timely manner in order to permit the Insured to comply with its obligations under HIPAA, make available such Protected Health Information to the Insured. This obligation shall continue only for so long as such information is maintained by the Company. In the event that the Insured agrees to comply with an Individual's request to amend such Protected Health Information, the Company shall incorporate any such amendments designated by the Insured. In the event that the Insured denies an Individual's request to amend such Protected Health Information, the Company shall incorporate into the Protected Health Information any of the statements and/or documents that the Insured has created or received with respect to such denial; provided that, the Insured has provided the Company with a copy of such statement and/or documents. In the event that any Individual requests an amendment to Protected Health Information pertaining to such Individual directly from the Company, the Company shall forward such request to the Insured. The determination of whether to amend such Protected Health Information pursuant to an Individual's request and/or the denial of such request (including the creation and/or maintenance of any notification and/or creation of documents in connection therewith) shall be the sole responsibility of the Insured.

(g) **Accounting of Disclosures.** The provisions of this Section 3(g) apply solely to those accountings of disclosures of Protected Health Information that are required of a health care provider pursuant to 45 C.F.R. § 164.528. The Company shall provide such accounting to the Insured in a timely manner in order to permit the Insured to comply with its obligations under HIPAA. In the event that the request for an accounting is delivered directly to the Company, the Company shall forward such request to the Insured. The provision of such accounting of such disclosures to the Individual (including the creation and/or maintenance of any notifications and/or documents in connection therewith) shall be the sole responsibility of the Insured.

(h) **Availability of Books and Records.** Except as otherwise prohibited by law, the Company hereby agrees to make its internal practices, books and records relating to the use and disclosure of Protected Health Information in connection with its obligations under this Agreement available to the Secretary of Health and Human Services for purposes of determining the Insured's compliance with the Administrative Simplification Provisions.

(i) **Use of Limited Data Set.** In the event that the Company receives or creates a limited data set (as described in 45 C.F.R. § 164.514(e)), then the Company shall only use and disclose such limited data set for research purposes, public health purposes or as otherwise Required by Law. In addition, the Company shall comply with Section 3(b), Section 3(c), and Section 3(d)(i) of this Agreement in the same manner as though such Sections referenced a limited data set, instead of Protected Health Information. Finally, except as otherwise permitted pursuant to this Agreement, the Company shall not re-identify the limited data set such that the limited data set becomes Protected Health Information and shall not contact any Individual who is the subject of the limited data set.

4.   **Personal Information**.  To the extent that the Company has access to Personal Information, the Company agrees that it has implemented and maintains appropriate security measures for the protection of Personal Information in accordance with applicable state laws.

5.   **Obligations of the Insured.**  The Insured shall have obtained all necessary consents and/or authorizations required under state law to enable the Insured to lawfully disclose the Protected Health Information to the Company and to enable the Company to use and disclose the Protected Health Information in accordance with the terms of this Agreement.  In addition, to the extent the Protected Health Information contains any psychotherapy notes (as defined under HIPAA), the Insured agrees to obtain all necessary authorizations to enable the Insured to lawfully disclose the Protected Health Information to the Company and to enable the Company to use and disclose the Protected Health Information in accordance with the terms of this Agreement.

6.   **Term and Termination.**  This Agreement shall remain in full force and effect until one of the following occurs (each, a "Termination Event"):  (a) the Company denies either the Insured's application for insurance coverage or the Insured's application for renewal of insurance coverage; (b) the Company or the Insured terminates the Insured's insurance coverage; (c) the Insured's insurance coverage with the Company expires; or (d) the Insured determines that the Company has breached a material term of this Agreement.

7.   **Return or Destruction of Protected Health Information.**  After the occurrence of a Termination Event, the Company shall either return or destroy all Protected Health Information, if any, which the Company still maintains.  The Company shall not retain any copies of such Protected Health Information.  Notwithstanding the foregoing, to the extent that the Company determines it is not feasible to return or destroy such Protected Health Information, the terms and provisions of Section 3 shall survive termination of this Agreement and such Protected Health Information shall be used or disclosed solely for such purpose or purposes which prevented the return or destruction of such Protected Health Information.

IN WITNESS WHEREOF, and intending to be legally bound, the Company affixes its signature below.


By:    Gregg L. Hanson
Title:  Chief Executive Officer

2173CV00120

# EXHIBIT 2

# DiMENTO & SULLIVAN

*ATTORNEYS AT LAW*

JAMES J. SULLIVAN, JR. (1956-1995)
FRANCIS J. DiMENTO
PHILIP A. TRACY, JR.
VINCENT J. DiMENTO
FRANCIS J. DiMENTO, JR.

ONE FANEUIL MARKETPLACE
SOUTH BUILDING, THIRD FLOOR
BOSTON, MASSACHUSETTS 02109-6142
(617) 523-2345
FACSIMILE: (617) 523-2346

OF COUNSEL
ROBERT G. WILSON, IV
JASON A. KOSOW
ROBERT J. MANNINO
CAROLYN M. CONWAY
PAUL T. PREW

April 20, 2020

Gregg L. Hanson,
CEO & President
COVERYS
1 Financial Center-13th Fl.
Boston, MA 02111

### Re: *Ryan Welter, M.D./ Joe Dickerson*

Dear Mr. Hanson:

This office represents Ryan Welter, M.D. regarding a claim for damages against Coverys and Joe Dickerson.

As you know, Dr. Welter has had his professional liability insurance with Coverys for several years. On October 12, 2017, Mr. Dickerson had an initial consultation with Dr. Welter. On October 19, 2017, Mr. Dickerson informed Dr. Welter that he was employed at Coverys and had reviewed Dr. Welter's file.

On November 1, 2017, Mr. Dickerson underwent a procedure performed by Dr. Welter. Thereafter, in February, 2018, Mr. Dickerson demanded that Dr. Welter refund the money paid for the procedure or he would take various actions, including public exposure and reporting Dr. Welter to the Board of Registration in Medicine ("BORIM") for alleged improprieties.

Apparently, Mr. Dickerson was not pleased with the results of the procedure even though he had signed informed consent forms which stated that results cannot be guaranteed. Mr. Dickerson was aware that there was a pending complaint against Dr. Welter at BORIM. This pending complaint at BORIM was not available to the public but known to Mr. Dickerson only because of his access to the Coverys file.

It is clear that Mr. Dickerson used his inside information to threaten Dr. Welter in order to gain leverage on his own personal matter. In late February, 2018, Mr. Dickerson initiated a complaint at BORIM against Dr. Welter which Coverys, interestingly, defended. The complaint is still pending before BORIM. In early March, 2018 Dr. Welter did reimburse Mr. Dickerson.

DiMENTO & SULLIVAN

Gregg L. Hanson,
 CEO & President
Page Two
April 20, 2020


        Coverys had a duty to maintain the confidentiality of the information contained in Dr.
Welter's file. This duty was breached by your employee Mr. Dickerson. Mr. Dickerson's threat
to harm Dr. Welter's career and reputation amounts to extortion. As a direct result of your
employee's misconduct, Dr. Welter has suffered a loss of business and reputation.

        We would like to resolve this matter amicably without resorting to litigation. Please
contact the undersigned at your earliest convenience so that we may discuss this matter further.
We trust that you will reply within thirty days of receipt of this letter. Thank you.


                        Very truly yours,

                        DiMENTO & SULLIVAN

                        Francis J. DiMento, Jr.

# EXHIBIT 3



VIA ELECTRONIC MAIL

August 21, 2020

Francis J. DiMento, Jr
DiMento & Sullivan
One Faneuil Marketplace
South Building, Third Floor
Boston, Massachusetts 02109
*fjdjr@dimentosullivan.com*

> RE:  <u>Ryan Welter, M.D./Joe Dickerson</u>

Dear Attorney DiMento:

I write in response to your April 20, 2020 letter to Gregg Hanson, CEO & President of Coverys. As you know, Coverys received your letter on June 3, 2020, and we have since engaged in and completed an internal investigation with regard to the issues raised. We appreciate your patience and cooperation while Coverys evaluated the matter.

At this time, Coverys is confident that any issues between our employee, Joe Dickerson, and the services and care provided by your client, Dr. Ryan Welter, have been resolved between them.[1]

Separately, your letter asserts that Coverys had a duty to maintain the confidentiality of the information contained in Dr. Welter's file, and that the duty was breached. Coverys has at all times treated Dr. Welter, a Coverys insured, in a proper manner with regard to his insurance coverage. There is no evidence that his files were improperly accessed or that information in Coverys' possession related to Dr. Welter was misused. During our investigation, we have learned that Dr. Welter has surrendered his license to practice medicine due to two complaints made to the Massachusetts Board of Registration in Medicine ("BORIM"). The BORIM site contains a copy of the attached Voluntary Agreement Not to Practice Medicine, dated May 2, 2019 (the "VANP"), signed by Dr. Welter. The VANP cites two docket numbers in the caption: 18-053 and 16-405. We understand that the 18-053 matter is a complaint brought by Mr. Dickerson. The 16-405 matter appears to be a complaint that is unrelated to Mr. Dickerson. Thus, in response to two separate and unrelated complaints made to BORIM, Dr. Welter voluntarily agreed to stop practicing medicine in Massachusetts. Dr. Welter did not notify Coverys of his change in license status.

In consideration of these facts, as well as the other facts stated in your letter and our investigation, Coverys has determined that there is no evidence of misuse of Dr. Welter's confidential information. Thus, Coverys cannot have been responsible for any loss of business or reputation alleged to have been suffered by Dr. Welter.

---

[1] On March 5, 2018, Mr. Dickerson and Dr. Welter executed a release, whereby Mr. Dickerson waived all claims against Dr. Welter in exchange for $4,000, which appears to have been paid to Mr. Dickerson that same day. The text messages between the two men suggest this was a negotiated amount, as Mr. Dickerson paid Dr. Welter $5,500 for the procedure and was demanding a full reimbursement at least as of February 21, 2018. The release contains confidentiality and non-disparagement provisions, which state that the terms of the settlement and release shall not be disclosed.

One Financial Ctr • Boston, MA 02111 • USA • +1 800.225.6168  coverys.com

Medical Professional Mutual Insurance Company • Preferred Professional Insurance Company® • ProSelect® Insurance Company

While Mr. Dickerson is not, and never has been, assigned to the accounts related to Dr. Welter, out of an abundance of caution Coverys has instructed Mr. Dickerson not to access those accounts and to refer any requests for assistance relating to Dr. Welter's policies to his manager without delay. Mr. Dickerson's supervisors have been informed of the conflict and asked to ensure that Mr. Dickerson does not access or work on accounts related to Dr. Welter.

Please let me know if you have any questions or would like to discuss this matter further.

Best regards,

Michael E. Murawski
Director, Associate General Counsel

Encl.